## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION

| | | |
|---|---|---|
| MOUNTAINEER MOTORS OF LENOIR, LLC, D/B/A, CAR GUYS MOUNTAINEER MOTORS, INDIVIDUALLY AND ON BEHALF OF THOSE SIMILARLY SITUATED, | ) ) ) ) ) ) | 5:22-cv-00171-KDB-DCK |
| Plaintiffs, | ) ) | **FIRST AMENDED COMPLAINT** |
| v. | ) ) | Claims under North Carolina Statutory and Common Law Unfair and Deceptive Trade Practices, the Federal Lanham Act, and N.C.G.S § 20-308.1 |
| CARVANA GROUP LLC.; CARVANA, LLC; CARVANA CARS, LLC; CARVANA FAC LLC; CARVANA LOGISTICS LLC; CARVANA CO., LLC; ERNEST GARCIA II; ERNEST GARCIA III; and DOES 1 THROUGH 10 | ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION: NATIONAL AND STATE CLASSES** **JURY TRIAL REQUESTED** |
| Defendants. | | |

Comes Now Plaintiff, Mountaineer Motors of Lenoir LLC (herein "Plaintiff"), individually and on behalf of a class of all others similarly situated (herein "Plaintiffs" or "The Class"), by and through their undersigned counsel, file this Complaint against Defendants, Carvana Group LLC, Carvana, LLC; Carvana Cars, LLC; Carvana Fac LLC; Carvana Logistics LLC; Carvana Co., LLC; Ernest Garcia II; Ernest Garcia III; and DOES 1 through 10 (collectively "Defendants" or "Carvana") and allege as follows:

## NATURE OF THE ACTION

1.   Named plaintiff brings this action individually and on behalf of licensed used car dealers in North Carolina and Nationally, who are market competitors injured by the Defendants pattern of avoidance and violation of applicable dealer licensing laws and engaging in deceptive advertising practices which have unjustly provided Carvana with an ill-gotten market advantage. Plaintiff and Class Members bring this action against Carvana for violations of the North Carolina Unfair and Deceptive Trade Practices Act, the North Carolina Common Law, the Federal Lanham Act, and the North Carolina Motor Vehicle Dealers Licensing Laws.

2.   Carvana's unfair and deceptive trade practices have directly caused Plaintiffs damages that consist of losses in their profits and loss of market share. Plaintiffs seek damages for those economic damages, to be trebled where applicable by law.

## BACKGROUND

**Follow the Money—The Garcia Family's Prolific History of Deception.**

3.   Based on available public filings, Carvana's single largest individual shareholder currently is defendant Ernest Garcia II (herein "Garcia senior"), a billionaire financier based in Arizona— where Carvana is headquartered. His son and fellow billionaire, defendant Ernest Garcia III ("Garcia junior" and collectively the "Garcias"), is credited as the co-founder, president, chairman, and CEO of some or all of the Defendants and generally the public-facing head of Carvana.

4.   Garcia senior's 1990 federal felony conviction of fraud and 1992 censure and a permanent bar from "membership or employment or association with any New York Stock Exchange member

or member organization" keeps him from formal high-level with Carvana—nevertheless, on information and belief, he serves as the unofficial chairman of Carvana.[1]

5. Garcia senior was an Arizona real estate developer until federal investigators began investigating his real estate and stock deals concerning the Lincoln Savings & Loan scandal. In or around 1990, Garcia Senior turned state's witness against his co-conspirators and took a deal to plead guilty to "fraudulently obtain[ing] a $30-million line of credit in a series of transactions that also helped Lincoln [Savings & Loan] hide its ownership . . . from regulators." At the time of his plea, U.S. Attorney General Dick Thornburgh stated: Garcia Senior's "'white-collar scheme – using "straw borrowers" – is of particular concern because it is designed to conceal the true nature of the financial transactions involved . . . . In the process, federal regulators are deceived, the institution is defrauded[,] and the taxpayers are left to foot the bill.'"[2]

6. Undeterred, undaunted, and enlightened on how to/not operate a national-scale criminal scheme, Garcia senior bought a rental car franchise called Ugly Duckling and merged it with his finance company to become one of—if not the—largest subprime lender and seller of used cars. Garcia senior took Ugly Duckling public in 1996 on the NASDAQ—as he was banned from the NYSE from his guilty plea to felony fraud six years prior.

7. On information and belief, some or all of the resources utilized in his finance company and dealings with Ugly Duckling derive, directly or indirectly, from his participation in the Lincoln

---

[1] In a derivative class suit against Carvana which has survived dismissal, that court found that Carvana's board members are beholden to, and thus not independent of, Garcia senior. *See Carvana Co. S'holders*, 2022 WL 2352457, at *1 ("Plaintiffs' allegations 'support a reasonable inference that there are very warm and thick personal ties of respect, loyalty, and affection' between Sullivan [a Carvana director] and Garcia Senior."); *see id*. at *16 (finding "plaintiffs have pled particularized facts raising a reasonable doubt as to Platt's independence").

[2] James S. Granelli, Lincoln S&L; Figure Pleads Guilty to Fraud: Crime: Ernest C. Garcia II admits acting to help the thrift hide its ownership of some risky desert land in Arizona, L.A. Times (Oct. 31, 1990), https://www.latimes.com/archives/la-xpm-1990-10-31-fi-3371-story.html.

Savings & Loan scheme. In that sense and on information and belief, his later "legitimate" business operations were founded on the benefits of his prior criminal actions.

8. Ugly Duckling fell apart within a few years of going public. The price of Ugly Duckling sunk from $25.00 per share to just $2.50 per share, and Garcia senior bought all the publicly owned shares. Meanwhile, Garcia senior directly benefited on the lead-up to and during the sharp decline; as Forbes reported at the time, "Garcia has been especially adept at feathering his own nest with Ugly Duckling's assets." After taking his publicly failed company private, Garcia senior renamed it "DriveTime," to remove the Ugly Ducking stench.[3]

9. In or around 2012, Garcia senior and his son founded Carvana Group LLC as a wholly owned subsidiary of DriveTime. According to Garcia junior, Carvana's reliance on DriveTime cannot be understated as "'[w]e were able to build Carvana into a stronger company much quicker than we likely would have been able to do without the benefits we had early in our company's history from being able to use the backbone of [DriveTime].'"[4]

10. In 2017, the Garcias—through junior—took Carvana public on the NYSE. As Garcia senior had done with its predecessor, the Garcias pitched Carvana as a disrupter and innovator in the used car market.

11. Garcia senior and Carvana's business dealings have appeared to have been direct and not at arm's length: "To add buildings for another 1,000 employees at its Phoenix-area corporate

---

[3] Jerry Knight, To Wall Street, It's a Swan, Wash. Post (Sept. 6, 1997), https://www.washingtonpost.com/archive/business/1997/09/26/to-wall-street-its-a-swan/7aa7026d-489c-44e2-8b3e-e6394d67ff90/; see also Nathan Vardi, Feathered Nest, Forbes,https://www.forbes.com/forbes/2001/1126/082.html?sh=56d6df22e88e

[4] Bill Alpert, Used-Car Prices Are Plunging. So Why Is Carvana's Stock Soaring? Time for a Rethink, Barron's (May 1, 2020), https://www.barrons.com/articles/used-car-prices-plunging-why-carvana-stock-soaring-51588342112.

campus, Mr. Garcia II bought the land.  To help pay for inspection centers getting cars  to customers faster, Carvana purchased a building from Mr. Garcia II and sold it for more."[5]

12. Since taking Carvana public, the Garcias have orchestrated a national scheme to deceive the investing and consumer public concerning the Company's growth, profitability, and superior business model.  The scheme's purpose was to—by any means necessary—pump up the price of Carvana's stock to allow the Garcia family—who owned and continue to own the lion's share of Carvana stock—to dump billions of dollars into their private pockets.

13. This scheme resulted in the personal earnings of several billion dollars for the Garcias. Over its lifetime, the stock peaked at around $360 per share and is currently trading at less than $10. Spectators of Carvana's financials have been concerned about the possibility of bankruptcy since at least the winter of 2022. Daniel Taylor, an accounting professor at the Wharton School of Business and director of the Wharton Forensic Analytics Lab, explained to  Forbes and The  Wall Street Journal that Garcia Senior's profiteering was nefarious, concluding: "What I'm saying is the Garcias knew it was short-lived[.] . . .  The Garcias knew the music would eventually end."[6]

**Three Distinct Damaged Groups: Consumers, Investors, and Market Competitors.**

14. Carvana's overall market impact in its roughly six-year dramatic rise and equally dramatic fall has had many direct and indirect victims.

---

[5] Margot Patrick, Kristin Broughton & Ben Foldy, Family Business Deals Help Fuel Carvana's Explosive Growth, Wall St. J. (Dec. 17, 2021), https://www.wsj.com/articles/family-business-deals-help-fuel-carvanas-explosive-growth-11639737181

[6] Ben    Foldy,  CEO's Father Gets a $3.6 Billion Stock Windfall at Carvana, Wall Street Journal (Sept. 17, 2021), https://www.wsj.com/articles/ceos-dad-gets-a-3-6-billion-stock-windfall-at-carvana-11631791801; Carvana CEO's Net Worth Skids But His Dad, Who Controls Company, Is Worth Nearly $3 Billion, Forbes (Dec. 8, 2022), https://www.forbes.com/sites/johnhyatt/2022/12/08/carvana-ceos-net-worth-skids-but-his-dad-who-controls-company-is-worth-nearly-3-billion/?sh=3baa11e163cf.

15. Carvana has also faced regulatory actions and legal challenges in several states, including Arizona, Illinois, California, Pennsylvania, Texas, Michigan, North Carolina, Maryland, and Florida.

16. Those respective directly damaged populations can best be grouped into three buckets:

a.   Investors: The investment community at large, from large-scale institutions and pension funds to individual causal investors, was damaged by the Garcias scheme to pump and dump Carvana. Several related suits have been filed around the country, including:

  i.   *In re Carvana Co. Securities Litigation*, No. CV-22-2126-PHX-MTL, United States District Court for District of Arizona.

  ii.   *In re Carvana Co. Stockholders Litigation*, Consolidated C.A. o. 2020-0415-KSJM, Chancery Court of Delaware.

  iii.   *Rodeo Collection LTD v. Carvana Co., et al.*, Case No. 2:22-cv-05778, United States District Court for New Jersey.

b.   Consumers: The broad consumer base for used cars in the United States was damaged because, as described further herein, Carvana's business model as a successful "pump and dump" scheme included a conscious disregard of the regulatory schemes, consumer protection laws, and responsibilities imposed upon licensed user car dealers. This disregard for the *corpus juris* regulating and protecting consumers in the markets places has manifested in many ways, and many consumers have taken legal action, including by way of the class action:

  i.   *Jennings et. al.  v. Carvana, LLC*, Case 2:21-cv-05400, United States District Court for The Eastern District of Pennsylvania..

c.      Market Competitors: Legitimate and law-abiding licensed used car dealers in North Carolina and nationwide were damaged by Carvana's lawless business model and false advertising, which improperly seized market share and thus revenue away from bona fide dealers. Marketing competitors in such circumstances have long had standing to sue under various theories and causes of action, as evidenced by at least one "sister suit" representing a class of dealers:

   i.   *Schrenk v. Carvana, LLC*, No. 2:19-cv-01302-TLN-CKD, 2022 U.S. Dist. LEXIS 35198, (E.D. Cal. Feb. 23, 2022) (Court denying Carvana's Motions to Dismiss on three of four claims by Plaintiff class, which was a state-only class of licensed used car dealers in California).

17. Plaintiffs, in this case, fit entirely within the market competitors' bucket, like *Schrenk*, and likewise have the standing to sue under the herein-asserted causes of action.

18. Again, critically, each of these three populations have been impacted distinctly by the previously described overarching scheme by the Garcias through their total domination and control of Carvana and related subsidiaries and other Garcia-owned enterprises. All three groups have unique legal standing and valid cause(s) of action for their respective damages. All three groups have at least one associated lawsuit currently in federal court.

**Regulatory Breaches, Enforcement Efforts, and The Current Situation.**

19. Carvana engages in deceptive advertising practices through their digital presence by offering used vehicles for sale in locations such as Hickory, and other North Carolina areas where Defendant lacks a license to operate a used car dealer, lacks an established office or salesroom as defined in N.C.G.S.A. § 20-286, and has no assigned licensed North Carolina sales representatives, this in violation of North Carolina motor vehicle dealers and manufacturers licensing laws.

20. The act of advertising a vehicle available in Hickory or in any other county/city in North Carolina reasonably implies that: 1- The Dealer offering the sale is in North Carolina 2- The vehicle is owned by the dealer offering the vehicle for sale. 3- The vehicle has passed a North Carolina State Inspection in the name of the selling dealer. This is not always the case when Carvana advertises vehicles as available in North Carolina and elsewhere.

21. Moreover, Defendants' sales practices do not include in the sales process any participation or communication with a North Carolina licensed sales representative. A North Carolina licensed Sales Representative must transact any discussion concerning a vehicle sale or purchase on behalf of a North Carolina Dealer. If a consumer responding to an advertisement specifying availability in North Carolina is communicating with an unlicensed agent, it is a violation of North Carolina law.

22. On information and belief, Carvana's used motor vehicle sales process is done entirely online.

23. North Carolina law requires all sales be made from the licensed location, the provision for home delivery implicitly indicates negotiations and formation of the contract for sale are accomplished prior to home delivery. The law explicitly states all agreements and documentation must be complete before presentation, and terms and conditions cannot be modified at delivery. N.C.G.S. § 20-287, § 20-291 and § 20-292

24. On information and belief, inquiries about Carvana's sales advertisements are initially sorted by artificial intelligence. The human respondents are in a call center not located in North Carolina and likely are not at any licensed sales facility. The vehicles are pooled in regional facilities, which are typically not located within North Carolina, and/or have not passed the required North Carolina inspection prior to being offered for retail sale within North Carolina.

25. Carvana admits to this practice in an advertisement on Indeed.com for a "Customer Advocate Position". They state they are not "salespeople," and that *"[w]ith the ability to search thousands of vehicles from our expansive inventory, to high-resolution 360° photographs of our vehicles' interior and exterior, to real-time financing and the ability to complete **contracts without visiting the back room of a dealership**, we provide a seamless, online car buying experience for consumers that can be completed from their desktop or mobile device. All our vehicles are inspected and reconditioned based on our 150-point certification checklist and come with a 7-day return policy. We also operate our own logistics network to deliver cars to customers as soon as the next day, as well as offer customer pick-up at our state-of-the-art Car Vending Machine locations (yes, you read that right). By putting customer satisfaction at the core of our business, we've built a no-pressure, no-haggle online car buying experience that save our customers time and money."*

26. The job description declares, ".… *Since* **Carvana's purchase process is entirely online**, *(our emphasis ) meeting you to receive their newly purchased vehicle will likely be the first time a customer has met a Carvana employee face-to-face!*..." [7]

27. Furthermore, according to the job description, in addition to delivering a vehicle to the customer, the Customer Advocate will also be "…accurately and efficiently completing **customer paperwork** as well as taking thorough notes in our customer tracking system…."

28. Carvana also advertises used vehicles for sale that third parties own, without disclosing this critical ownership factor to potential customers. Through these unfair, false, and/or deceptive advertising practices, Defendants have unjustly lured away customers and potential customers

---

[7] https://www.glassdoor.com/job-listing/customer-advocate-vehicle-delivery-carvana-JV_IC1138634_KO0,34_KE35,42.htm?jl=1008363961237

from law-abiding marker competitors, causing them losses and harm, while Defendant unfairly gains market advantage.

29. These actions are deceptive for the customers or potential customers who will initiate a transaction under the false belief that a unit is their "area." After receiving the unit, buyers in North Carolina and nationwide have had to unjustly and unreasonably wait for prolonged periods of time to be able to actually drive their newly purchased unit due to the numerous regulatory compliance issues it may have, such as lack of state inspections, temporary tags, title issues, etc.

30. Meanwhile, Plaintiff, and class members, who pay the related administrative and compliance costs to operate as used car dealers legally, have an established salesroom with assigned North Carolina licensed salesmen, and otherwise, have and/or are losing market share in effectively every region of the state as Carvana deceptively advertises to have available used vehicles for sale "nearby."

31. Carvana advertises that their vehicles can be delivered "anywhere." However, under North Carolina law, if a vehicle is advertised to be in North Carolina specifically, it has to be in North Carolina, at a licensed location and must be state inspected **prior to advertising it for sale as in North Carolina.**

32. The false, misleading, and deceptive practice of implying the vehicle is available in any particular area is devised to maximize SEO's (search engine optimization) when a consumer starts an internet search. Additional searches with changing location terms reveal the same car as being "available" and "nearby" in multiple North Carolina cities simultaneously. Those searches state the "location" of the vehicle currently available and offered for sale in North Carolina. This advertisement is objectively false since the unit cannot be everywhere at once.

33. Plaintiff–and those similarly situated—have and continue to suffer damages due to Carvana's regular practices of avoiding the administrative costs of obeying regulations and advertising laws to take sales away from legitimate dealers. Accordingly, Plaintiff and Class Members file this complaint against Carvana for violations of the North Carolina Unfair and Deceptive Trade Practices Act, the North Carolina Common Law, the Federal Lanham Act, and the North Carolina Motor Vehicle Dealers Licensing Laws.

34. According to a Cross-Sell article, Carvana has impacted the automotive industry by committing market share robbery from many used car retailers nationwide. Carvana has substantially cut into the traditional retailers' used car market share in North Carolina. For example, in the Raleigh market, the franchised dealers Capitol Ford and Hendrick Toyota lost 306 and 141 used vehicle sales in 2018, respectively. In March 2019, Carvana passed Capitol Ford in used car vehicle sales for the first time. And by the end of 2019, they crept into the top three of North Carolina's highest-selling automotive retailers.[8]

---

[8] By Admin; "Carvana Market Takeover: Raleigh, NC"; Cross Sell; (February 27, 2020); https://blog.cross-sell.com/blog/carvana-market-takeover-raleigh-nc.

35. More recently, their total market share in North Carolina was nearly 10% with only three likely-unmanned locations which, at various times, have had suspended licenses since Carvana entered the North Carolina market. See below from https://www.cross-sell.com/carvana-sales-data:



Carvana Market Share By State (Feb 2022)

36. On August 2, 2021, the State of North Carolina suspended Carvana's Raleigh area dealers license for, among other infractions of dealer licensing laws—not delivering vehicle titles to the Department of Motor Vehicles on time and for improperly issuing out-of-state temporary tags and plates to buyers who had no connection to the states from which the temporary tags and plates were issued. Also, investigations found that Carvana sold vehicles in Raleigh that were not given state inspections. For similar reasons and around the same time in 2021, the Department placed on probation Carvana's license for the Charlotte location.

37. On or about 10 June May 2021, NC DMV served an administrative Decision on Carvana (Raleigh location), finding that Petitioner committed two Type I violations and one Type II violation. Specifically, Respondent found a Type I violation under N.C.G.S. §§ 20-294(2) and(11) based on Petitioner's failure to timely deliver title work to Respondent Division as required by N.C.G.S. § 20-75; a Type I violation under N.C.G.S. § 20-294(6) for an unfair method of

Case 5:22-cv-00171-KDB-DCK   Document 25   Filed 03/03/23   Page 12 of 52

competition or unfair deceptive act or practice for issuing an out-of-state temporary tags/plates for a vehicle sold to a North Carolina resident; and one Type II violation under N.C.G.S. §§ 20-294(2) and (6) by offering a motor vehicle for sale without a North Carolina State Inspection as required by N.C.G.S. § 20-183.4C. Based on these violations, Respondent Division revoked Petitioner's Dealer License . Carvana has long been aware that the practice of selling vehicles without possession of the title is an unfair and deceptive practice.

38. Upon information and belief, the NC DMV revoked the Raleigh license in Admin proceedings in 2021. That revocation was modified to a 12-month suspension in a Consent Agreement negotiated by NC DOJ after Carvana petitioned for Judicial Review in Wake Co. Superior Court.

39. Upon Information and belief, NC DMV arguably had or has very little jurisdiction over many relevant NC consumer purchases as the sales were structured to be originating out-of-state state Carvana locations. This, conveniently or intentionally, plays into Carvana's overall scheme of avoiding administrative costs.

**PARTIES**

40. Plaintiff, Mountaineer Motors of Lenoir, LLC, is a domestic corporation, organized and existing under and by the laws of the State of North Carolina, with its principal place of business at 1447 Morganton Blvd, Lenoir, NC 28645. Mountaineer Motors of Lenoir, LLC also does business as Car Guys Mountaineer Motors (herein "Plaintiff").

41. Upon information and belief, Defendant Carvana, LLC and Carvana Co., LLC are Delaware corporations with principal offices in Arizona and registered in North Carolina as a Foreign Limited Liability entities that may be served through a registered agent, Corporation Service Company, at 2626 Glenwood Ave Ste 550, Raleigh, NC 27608.

42. Upon information and belief, Defendant Carvana Group LLC is a Delaware Limited Liability Company with its headquarters and principal place of business located at 1930 West Rio Salado Parkway, Tempe, Arizona 85281. At present, North Carolina Secretary of State shows no business address within the state of North Carolina and no authorized license to do business in North Carolina.

43. Upon information and belief, Defendant Carvana Fac LLC is incorporated in Delaware and registered in North Carolina as a Foreign Limited Liability Company. It may be served by its registered agent, "Corporation Service Company," at 2626 Glenwood Ave Ste 550 Raleigh, NC 27608.

44. Upon information and belief, Defendant Carvana Logistics LLC is incorporated in Delaware and registered in North Carolina as a Foreign Limited Liability Company. It may be served by its registered agent named "Corporation Service Company" at 2626 Glenwood Ave Ste 550 Raleigh, NC 27608.

45. Upon Information and belief, Defendant Carvana Cars, LLC is incorporated in Delaware and registered in North Carolina as a Foreign Limited Liability Company. It may be served through its registered agent Corporation Service Company at 2626 Glenwood Ave Ste 550, Raleigh, NC 27608.

46. Carvana is controlled by the Garcia family. Its CEO, Chairman, and President, Ernest Garcia III is the son of Ernest Garcia II, who—after taking a plea deal of federal felony fraud and turning state's witness on co-conspirators in a national scheme—amassed a fortune by selling cars and financing packages to individuals with poor credit. Garcia senior and Garcia junior control the overwhelming majority of Carvana's voting power.

47. Defendant Ernest Garcia III is a co-founder of the Company and has served as its CEO, President, and Chairman since 2012. He has been Carvana's CEO and the Chairman of its Board since the Company's inception. Before launching Carvana, Garcia III worked for his father's company, DriveTime Automotive Group Inc.

48. Defendant Ernest Garcia II is the largest single seller of Carvana stock throughout the relevant period. Garcia senior is the largest owner of the Company's former parent company, DriveTime. Leading up to and throughout the relevant period, Carvana engaged in many related-party transactions with Garcia senior and his companies that were, on information and belief, not negotiated at arm's length. Garcia senior also "stacked the board" of Carvana corporate defendants with friends and colleagues acting as formal intermediaries and insulators—thinly veiled—of his total control of Carvana from the top down.

49. The Garcias control and completely dominate Carvana, including the policy and business practice(s) herein alleged and challenged, such that Carvana had, at all relevant times, no separate mind, will, or existence of its own. This control was used by the Garcias to commit wrongs, perpetrate violations of statutory legal duties, or act dishonestly and unjustly such that the act(s) contravenes the rights of the Plaintiffs—who were, in turn, proximately injured by those actions. As such, piercing the corporate veil to pursue action against them individually is proper and supported by North Carolina substantive law.

50. Plaintiff is without sufficient information of all the actual names, capacities, relationships, and extent of participation in the conduct herein alleged, of the Defendants sued herein as Does 1 through 10, inclusive, but on information and belief alleges that said Defendants are legally responsible for the conduct, the business acts, and unlawful, unfair, and deceptive practices alleged herein, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this

complaint to allege the actual names and capacities of the Doe Defendants when ascertained as permitted by the laws of the State of North Carolina.

## JURISDICTION AND VENUE

51. Venue in the Western District of North Carolina, Statesville Division, is proper in because the named plaintiff is a business operating in Caldwell County, because a substantial part of the causes of action relevant to the Plaintiff arose in Caldwell County, Defendant usually does business in Caldwell County, and Plaintiff resides in Caldwell County.

52. Further, Plaintiff has asserted a Federal Question private right of action in the Lanham Act, which has concurrent State and Federal subject matter jurisdiction.

53. Finally, due to the nature of both proposed classes in this suit, Plaintiff has a good faith belief that the jurisdictional provisions of the Class Action Fairness Act will apply to this matter, which necessitates federal venue and requires only minimal diversity for subject matter jurisdiction.

54. Personal jurisdiction exists over Defendants in that they have engaged in substantial activity within North Carolina. This is true for the area constituting the Western District and Statesville Division. They have maintained continuous and systematic contacts within the State of North Carolina, and on information and belief, have made targeted advertisements and sold thousands of vehicles to North Carolina residents, including within the Statesville Division's jurisdiction.

## FACTUAL ALLEGATIONS

55. Since 2007, Plaintiff has operated as a duly licensed used motor vehicle dealer in Caldwell County.

56. North Carolina's Motor Vehicles and Manufacturing Licensing law declares the public policy regarding the regulation and requisites for used motor vehicle dealers in North Carolina. Specifically, § 20-285, titled *Regulation of Motor Vehicle Distribution in Public Interest,* declares:

> [T}he distribution of motor vehicles in the State of North Carolina vitally affects the general economy of the State and the public interest and public welfare, and in the exercise of its police power, it is necessary to regulate and license motor vehicle manufacturers, distributors, dealers, salesmen, and their representatives doing business in North Carolina, **in order to prevent frauds, impositions and other abuses upon its citizens and to protect and preserve the investments and properties of the citizens of this State**.

(Emphasis added.)

57. Carvana entered the North Carolina used vehicle dealer market through their usual national-marketing practice, which is through targeted advertisements on platforms such as television, the internet, and social media platforms, and the use of used vehicle sales marketing by entities such as craigslist.com, autotrader.com or through its website portal, carvana.com. In these advertisements, Carvana offers a vast catalog of options with the availability of the exact model the consumer wants, and conveniently nearby.

58. Carvana deceptively advertises that it has units available within a specific county or area—such as Hickory, and other areas of North Carolina where it does not have a licensed dealership, nor an established salesroom or office with assigned North Carolina licensed salespeople.

59. Carvana has and continues to offer units for sale in different locations than they actually are—sometimes radically different locations. The units have been known to even be in another state, but Carvana deceptively withholds or buries this information from the buyer.

60. Carvana engages in unfair competition and misappropriates a commercial advantage by falsely advertising to the consuming public that they have units available within towns like Hickory and across North Carolina and the entire United States, where they do not have a licensed dealership and without disclosing where the offered vehicle actually is.

61. Carvana's website appears high on the search results list when a consumer types "used car sale in Hickory," due to, on information and belief, Carvana's high marketing budget for SEO. These advertisements referencing off-site, fictitious, and unlicensed locations violate § 20-292 of the North Carolina Motor Vehicle Dealers and Manufacturing Licensing Law.

62. Carvana has three locations in North Carolina, specifically in Raleigh, Charlotte, and Greensboro. Each location has its own used car dealer license with the NC DMV. These locations consist of a building that operates as a giant car-vending machine. Carvana delivers the purchased cars through this vending machine building and direct delivery to buyers throughout North Carolina, when applicable.

63. Carvana's vending machine buildings do not currently comply with the dealer licensing laws requirements of North Carolina. There is no established salesroom to conspicuously display a license with the required information, such as a list of licensed salespeople. Upon information and belief, there are very few, if any, licensed North Carolina sales representatives actually working on those premises. There is no place where the books, records, and files of vehicle sales are kept [§ 20-286(6) and 20 -297], no place at which permanent business of bartering, trading, and selling motor vehicles take place whereby the public can contact the dealer at reasonable times [§ 20-290], and no place for inspection of point-of-sale records for used vehicle sales [§ 20-294]. Indeed, there is no way a DMV inspector can walk in to conduct any oversight to verify compliance.

64. Upon information, many NC Dealers have faced citation, suspension, or revocation for displaying, advertising, or selling a vehicle before passing a NC safety Inspection. The Inspection would also have to be conducted to the county's specifications where the dealer licensee sales facility was located. The three Carvana licensed locations are all in OBD2-required counties

(Wake, Guilford, and Mecklenburg), thus requiring any vehicle offered for sale in NC by Carvana is required to pass not only a Safety Inspection but an OBD2 emissions inspection prior to being offered for sale. On information and belief, this is yet another compliance cost and regulation that Carvana chooses to ignore.

65. Even though in 2021, § 20-292 of the Motor Vehicle Dealers and Manufacturing Licensing Law was amended to permit delivery of a purchased vehicle at another location other than the dealer's licensed establishment, such as the buyer's home or workplace, Carvana was already delivering used motor vehicles to buyers at their homes and other locations long before the law was amended in open infringement of the law. And, in their open disobedience of relevant laws and regulations, Carvana seized a market-share advantage over legitimate dealers who abided by and paid the costs related to following the same rules Carvana openly ignored.

66. Upon information and belief, many dealers' licenses were cited, suspended, or revoked specifically for offering, displaying, and/or selling a motor vehicle off of the licensed premises before, and after the amendment went into effect. This has been as extreme as displaying vehicles on a parcel of land more than 500 feet away from the licensed location. *See Street Dreams v NC DMV,* 2019 Hearing Officer Order and Cleveland Co 19-CVS-93 Petition for Judicial Review & Consent agreement.

67. Despite recent changes to the law permitting the off-site delivery of purchased vehicles, Carvana is still acting illegally since it continues to advertise off-site sales through off-site, unlicensed, and fictitious locations. See N.C.G.S. § 20-292.

68. Moreover, the 2021 § 20-292 amendment requires all forms and documents to have been fully agreed to and fully completed in advance of their presentation to the customer and no additional negotiations or modifications related to the content of said forms and documents, other

than the correction of clerical or typographical errors, can take place. Complaints have been made in North Carolina that Carvana does not comply with this requirement by amending and further negotiating the agreement's essential terms after the purchased vehicle is delivered to the buyer.

69. Consumers cannot see a vehicle's "Buyers Guide" before purchasing it, as required by the FTC. See 16 C.F.R. Part 455.2 (a). Carvana sells its vehicles without a prominently displayed "Buyer's Guide," which is required by federal and North Carolina law to be placed on the vehicle at the time of sale. See North Carolina Administrative Code, Title 19a., NCAC 3D.0236.

70. This conduct also violates mandates by the Federal Trade Commission ("FTC") regulations at 16 C.F.R. Part 455. Without the required Buyer's Guide documentation, a reasonable consumer would not know whether the vehicle being sold is a "new" or a "used" vehicle and would not be advised of any material attributes about the vehicle. As licensed used motor vehicle dealers, Plaintiffs must comply with such legal and regulatory requirements or face fines and loss of their dealership license. Plaintiffs do so—at added administrative cost for regulatory compliance— while Carvana profits further simply by deciding not to follow the law.

71. On information and belief, Carvana markets a non-contractual seven-day return policy that is implemented ad hoc, meaning Carvana consumers can only test drive a vehicle after purchasing it. Because Carvana requires purchasers to arbitrate disputes rather than allow for open litigation in Court, there is no way to determine whether Carvana does anything to honor the 7-day "grace period" promise that it markets to consumers.

72. Carvana engages in false and deceptive marketing practices by advertising through different platforms used vehicles for sale from fictitious and unlicensed locations and by selling used vehicles without holding their titles and disclosing this critical information to the purchaser.

73. Upon information and belief, as a regular business practice, Carvana offers vehicles for retail sale in NC prior to securing the title for the vehicle or even confirming the status of the title.

74. Upon information and belief, Carvana also violated the Department's or FTC regulations by marketing and selling with list prices that did not disclose the exclusion of fees, taxes, title, and licensing charges, delivering vehicles without a prominent displayed Buyer's guide, falsely advertising no hidden costs, and unlawfully employing unlicensed salespersons.

75. Carvana operates as a "motor vehicle dealer" and/or as a "used motor vehicle dealer "as defined under § 20-286, subsection 11 (a) and 16, respectively of Art. 12 of the Motor Vehicle Dealers and Manufacturing Licensing Law. Carvana deals in and sells vehicles, as described therein, and the 13 exceptions listed in subsection 11(b) do not apply to Defendants.   Therefore, Carvana is a "motor vehicle dealers" and/or "used motor vehicle dealers" within the meaning of § 20-286, subsection 11 and 16 of Art. 12 of the Motor Vehicle Dealers and Manufacturing Licensing Law.

76. Subsection 16 of § 20-286 of Art. 12 of the Motor Vehicle Dealers and Manufacturing Licensing Law defines a used motor vehicle dealer as

*"A motor vehicle dealer who buys, sells or exchanges, or offers or attempts to negotiate a sale or exchange of an interest in, or who is engaged, wholly or in part, in the business of selling, used motor vehicles only."*

77. Carvana has operated and continues to operate in North Carolina, willfully or recklessly ignoring or otherwise bypassing applicable regulations followed by Plaintiff class(s). The alleged activities herein constitute a pattern of unfair and deceptive practices under North Carolina law and one or more breaches of the Lanham Act.

78. On information and belief, Carvana sold and continues to sell used motor vehicles in North Carolina despite the suspension of their license(s) by the DMV. Sales occur at the time and place at which the seller physically delivers the goods. N.C.G.S.A. § 25-2-401.

79. Carvana unlawfully sells/sold vehicles marketed to the Raleigh Market by originating sales from other Carvana licensed locations. Upon information and belief, many of these sales originated from their out-of-state dealerships. The practice of documenting the sales from an out-of-state license is an effort to deny the retail buyer many NC consumer protections, limits NC DMV jurisdiction, and renders the Raleigh suspension toothless. This is a blatant disregard for state regulation, which imperils consumer protections and flies in the face of the duty of good faith and fair dealing mandated in UCC 2 and codified in N.C.G.S. 25-2.

80. In addition to the excessive delays in vehicle title transfers, issues with insufficient or faulty inspections have been widely reported by consumers. Carvana claims through its website to test drive the vehicle, perform detailed inspections, verify that each vehicle is repaired to meet strict standards, and inform buyers of any significant imperfections on the vehicle. However, consumer reviews document instances where buyers question whether their vehicles passed Carvana's so-called thorough inspections and promised standards.

81. Although North Carolina officials have placed on probation and/or suspended Carvana's licenses to operate in two North Carolina locations, Carvana's ability to sell cars in the state has yet to be substantially impacted since Carvana continues to sell used cars online, rendering the necessity of compliance with state-issued licenses simply superfluous.

82. Outside of violating state and federal laws, the consumer complaints in the Department against Carvana show that the company has failed to meet its own guarantees to consumers.

Carvana claims that the vehicles it sells have gone through an inspection process, even though the cars sold in Raleigh demonstrate that this is not always the case.[9]

83. On information and belief, Carvana enters into written retail installment contracts (RISC) with the consumer, in which Carvana promises to manage the permanent registration of the purchased vehicle in the state. Consumers are persuaded to purchase their units under this type of promise, but later, Carvana breaches its contractual duties. This is another unfair and deceptive trade practice that, in addition to affecting the consumer, has caused used car dealers, such as Plaintiff and Class Members, to lose their customers and therefore see their sales drop.

84. Upon information and belief, many of these RISC are assigned to Bridgecrest Financial, an auto loan servicer and a subsidiary of Drivetime. While many observers, stockholders, and analyst report Carvana has posted losses averaging $2200 per sale in FY 2022, upon information and belief, a common business plan in the auto industry is to generate minimal gross profit on the sale of the vehicle and build profit in the financing, insurance, and service contract products. Bridgecrest is not an entity of Carvana. However, the per unit "losses" experienced by Carvana are believed to be funneled to Bridgecrest through their profits on financing and ancillary financed products. This only furthers the Garcias efforts of illegal self-enrichment by any means necessary.

85. Carvana's business is about maintaining an extensive used-car catalog on its website with which other used motor vehicle dealers, such as Plaintiff and Class Members, cannot legally compete. They do this and make targeted advertising to customers with false and misleading information, leveraging "new tech" to unjustly wiggle around the *corpus juris* regarding used car dealership regulations and consumer protections—avoiding considerable compliance costs for every transaction.

---

[9] S. Aburahma; Carvana is Banned From Selling Cars In North Carolina Until 2022; getjerry.com; (June 27, 2022); https://getjerry.com/insights/carvana-banned-selling-cars-north-carolina-2022.

86. On information and belief, Carvana buys vehicles regardless of whether they have an up-to-date title or not and without knowing when or if they will obtain the titles.

87. As a direct result of Plaintiffs' inability to lawfully compete with Defendants' compliance-cost cutting, Plaintiffs have suffered and continue to suffer damages, including loss of profits and loss of market share. Indeed, Plaintiff anticipates the potential inclusion of class members for whom Carvana's illicit activities were the proximate cause of going out of business or declaring bankruptcy.

88. Additionally, Carvana lists cars online as physically located on dealership lots that it does not own. Carvana calls this "Marketplace" inventory. Upon information and belief, Carvana enters the third-party marketplace business model around August of 2020. Carvana third party marketplace business model is based on selling "partner inventory" cars, offered by dealers, under its own brand. Upon information and belief, these third-party entities involved in the Carvana Marketplace were asked to sign a non-disclosure agreement.

89. These third-party entities are labeled on Carvana's website as "Carvana partner". Defendants define Carvana partner as a "hand-selected small number of automotive retail partners who are able to list their inventory on our website." (See below) Carvana does not disclose to consumers who actually owns the car before a potential sale.

HOW OUR
# PARTNERSHIPS WORK

### MORE CARS. SAME HIGH STANDARDS.
### BROUGHT TO YOUR DRIVEWAY.

Carvana has hand-selected a group of partners to provide an intelligently curated set of vehicles that broaden the array you have to choose from. We only sell cars that we would sell to our own moms. This, like every vehicle, underwent the same level of rigorous inspection and reconditioning as the rest of our cars, is backed by our 7 Day Return Policy, and includes our 100 Day/4,189-mile Limited Warranty.



**SHOP**
Browse thousands of cars (including this one) to find exactly what you want. Compare trims, options, brands, and more to find the perfect vehicle.



**CHECKOUT**
Carvana's checkout process makes it easy to apply for financing, add a vehicle service contract or GAP, and schedule your delivery. Once you're done, we will confirm the car's availability from our partner dealer to finalize your deal.



**ENJOY**
All of Carvana's Partner Inventory comes standard with our 7 Day Return Policy and our 100 Day/4,189-mile Limited Warranty.

90. This is a prima facie violation of North Carolina Administrative Code, Title 19A., NCAC 3D.0226, that details requirements and limitations of vehicle consignment by NC Dealers. Specifically, a consignment agreement must be on file with the selling dealer (this is implied to be the specific NC licensed dealership, not an interstate "clearinghouse"). The consignment must be clearly disclosed to the consumer, and cannot be consigned from another retail dealer. Sales of one dealer's inventory by a different dealer have been treated as multiple violations by both dealers. 20-294 (1)(2) and (6) unlawful sale by the unlicensed salesperson (against the selling dealer), unlawful sale off licensed premises (against the owning dealer), unlawful consignment (against both dealers) and failure to disclose true owner/consignor (selling dealer). NC Dealers

have faced revocation and fines for offering to sell other dealers' inventory. The intent of the law is to assure a consumer knows who they are buying from, and where to go in the event an issue arises from the purchase.

91. Defendants list these third-party vehicles with an ambiguous "Marketplace" or "Partner" label to identify them in Carvana 's Inventory (See below)



92. Upon information and belief, Carvana signed a consignment contract with these third-party entities. A "consignment" exists where a consignor leaves his property with a consignee who is substantially engaged in selling the goods of others and will work to sell the goods on behalf of the consignor. *Nasco Equipment Co. v. Mason*, 291 N.C. 145, 154, 229 S.E.2d 278, 285 (1976).

93. Upon information and belief, one of those third-party wholesalers is Hertz Car Rental. Carvana signed a consignment contract with Hertz Car Rental, and they sold their wholesale inventory through The Marketplace.[10] Defendant does not disclose to consumers that the "partner's" vehicles posted on their website for sale are former rental cars. Defendant even blurred signs of its partner's vehicles, such as Hertz, actively concealing who the real owner is. (See below).



---

[10] J. Muller: How Hertz is fighting to stay relevant. Axios (Oct 28, 2021)
https://www.prnewswire.com/news-releases/hertz-and-carvana-partner-to-boost-online-sales-301409374.html

94. Upon information and belief, Carvana does not own or possess these partners' vehicles posted on its website, nor does it have a consignment contract for each vehicle executed by both parties. This does not comply with public policies and regulations from the State of North Carolina. (See North Carolina Administrative Code, Title 19A., NCAC 3D.0226).

95. Hertz Rental Car has licensed retail locations in NC, located in Raleigh, Charlotte and Winston Salem. NC Dealers in those cities and surrounding areas can only consign from non-retail sources.

96. This practice unlawfully, unfairly, and uniquely expands the inventory of Carvana, further expanding its fundamentally fictitious market exposure and deceptively inflating its available inventory. Upon further information and belief, these vehicles are never physically in possession or displayed by Carvana at any of their licensed locations, and, if available in NC at all, they are actually on display and offered for sale at a Hertz-licensed location.

97. Hertz Car Rental has stated that this consignment agreement with Carvana is a way of fetching higher prices and better margins for its former-rental cars, rather than selling them at auction or its own retail network of Hertz Car Sales locations.[11] Hertz has also stated that the Carvana agreement allow them to "avoid discounts that it accepts through its normal car-selling process."[12] This constitutes a per-se unfair and deceptive trade practice under North Carolina law.

98. This misleading information has a reasonable likelihood to deceive the general consuming public. Such patterns of consumer deception have direct and proximately causation to economic damages of law-abiding market competitors.

---

[11] Id.

[12] G. Spencer: Hertz to sell used rentals through Carvana's marketplace. AIMGroup. (Oct. https://aimgroup.com/2021/10/27/hertz-to-sell-used-rentals-through-carvanas-marketplace/

99. Carvana Defendants engaged in unfair competition with Plaintiff and class members by purposefully avoiding the legal requirements mandated by law to engage in used motor vehicle sales in North Carolina.

100.    This undisclosed "marketplace" inventory is a deceptive practice that misleads customers and consequently affects Plaintiff since these deceptions attract customers to Defendants' business and— necessarily—away from Plaintiff, unfairly usurping business potential and causing them to lose revenue, by engaging in illicit advertising practices and avoiding the standard costs necessary to abide by relevant regulations.

101.    Carvana Defendants' sales and profits thrived as a direct result of violating dealer licensing laws and consumer laws, while Plaintiffs' sales decreased as a direct result of Carvana Defendants' unfair competition.

102.    Defendants' used car sales practices proximately caused harm to Plaintiff. Plaintiffs and Class Members have been damaged individually or cumulatively in an amount to be proven at trial. The damages should be trebled, and Plaintiffs and Class Members should be allowed to recover attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.

103.    In 2017, Carvana opened North Carolina's first Vending Machine in Raleigh. In 2018 Carvana announced  the launch of a second vending machine in Charlotte. about an hour away from Plaintiff. Plaintiff noticed his used car sales gradually started to drop. From 494 units sold in 2017, Car Guys sales drastically dropped by approximately 23% to 380 units in 2018.  In 2019 the sales of units sold dropped again by roughly 27%.

104.    Regardless of the Department's administrative actions taken against Carvana, Carvana has continued operating with gross disregard for public policy and laws applicable to used car dealers. As mentioned above, Carvana engages in illegal and deceptive conduct by selling cars

without the due state inspections, causing excessive delays of vehicle title transfers, selling used vehicles without having an established dealership location, and reissuing out-of-state temporary tags, among other illegal and deceptive acts.

105.    Other dealerships authorized and licensed to sell used vehicles in North Carolina have suffered typical market-competitor population injuries, although the amounts of losses and restitution may vary between class members. Carvana continues sell cars in North Carolina doing business as a used motor vehicle dealer, through its unfair business practices and misleading and deceptive advertising.

106.    Carvana has impacted the automotive industry by committing market share robbery from many used car retailers nationwide. In its Full Year 2019 performance news release and letter to Shareholders, Carvana reported: Retail Units Sold of 177,549 vehicles, an 89% increase YoY; Increase in vehicles purchased from customers by 231% YoY; Earnings of $3.94 billion in revenue, a 101% increase YoY; Fastest organic growth of any automotive retailer in U.S. history (+83,441retail units). By the end of 2019, they crept into the top three of North Carolina's highest-selling automotive retailers.

107.    In 2019, Carvana Raleigh secured the #3 spot of Top Selling Retailers in North Carolina, while Carvana Charlotte crept up to the # 9 spot during the second half of 2019.[13]

108.    The previously asserted improper and unlawful practices were not only widespread across North Carolina. The following findings prove this is a behavior pattern that Defendant follows nationwide.

---

[13] By Admin; "Carvana Market Takeover: Raleigh, NC"; Cross Sell; (February 27, 2020); https://blog.cross-sell.com/blog/carvana-market-takeover-raleigh-nc.

109.     On November 15, 2022, the State of Pennsylvania suspended two Carvana locations in Philadelphia and Bridgeville area dealer licenses until December 28, 2022.[14] In May 2022, the State of Illinois suspended Carvana's area dealer license for conducting business in a way that violates Illinois laws, according to the Secretary of State's office Carvana was improperly supplying customers in the state with out-of-state temporary plates and its failure to transfer title to cars sold there in a timely manner.[15] In Michigan, Carvana was placed on 18-month probation for violating vehicle registration law.[16] Carvana paid $850,000 to four counties in California in a civil lawsuit when Carvana sold and transported cars without the proper licenses.[17] Since 2019, the Texas Department of Motor Vehicles has cited Carvana with more than 30 violations along with issuing more than $10,000 in fines for violating state registration laws.[18] Even Carvana's home state of Arizona has received more than 80 complaints about the company over a four-year period.

---

[14] Jacob Olivia; Carvana Faces Title And Registration Issues Again, This Time In PA; Motor1.com; (Nov 15, 2022); https://www.motor1.com/news/621947/carvana-title-registration-issues-pennsylvania/.

[15] Jacob Adelman; Illinois Suspends Carvana's Dealer's License Over Late Registration and 'Improper' Tags; (May 13, 2022); https://www.barrons.com/articles/illinois-suspends-carvana-dealers-license-51652475179.

[16] Angela Benander; Department of State suspends Novi dealership; Michigan.gov; (October 07, 2022); https://www.michigan.gov/sos/resources/news/2022/10/07/department-of-state-suspends-novi-dealership.

[17] P.J. Johnson; Online Vehicle Retailer Settles Consumer Protection Lawsuit.; Los Angeles County District, Attorney's Office; (August 3, 2021); https://da.lacounty.gov/media/news/online-vehicle-retailer-settles-consumer-protection-lawsuit.

[18] By Admin; Online Car Seller Carvana Hit With Dozens of State Violations As Customers Report Paperwork Troubles. CBS Broadcasting Inc.; (November 15, 2021); https://www.cbsnews.com/dfw/news/online-car-seller-carvana-hit-texas-state-violations-customers-paperwork-troubles/.

110.    In 2021, the Better Business Bureau received more than 900 consumer complaints against Carvana about issues that include incorrect paperwork and delays in getting titles and registrations.[19]

111.    On June 24, 2022, Barron's published an article entitled "Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars [,]" which described several issues with Carvana.

112.    The Barron's article stated the following regarding Carvana's issues with registration and title : *"...But as the economy has reopened, Carvana's efforts to resume its torrid pandemic-era sales pace have been complicated by an inconvenient side effect of the growth: In its haste to seize market share from competitors, Carvana was selling cars faster than it could get them registered to their new owners..."* *"...Barron's interviews with Carvana customers and former employees shed light on why registrations were delayed and how state regulators have tried to address the issue. The reporting reveals a company scrambling to address the problem, at one point forming an ad hoc unit known as the "undriveable-car task force..."*[20]

113.    In other instances, though, including Burton's, Carvana sold cars before it had title to the vehicles, an illegal action in many states where the company does business, including North Carolina.

---

[19] Tony Owusu; Carvana Drops, Complaint Against Car Retailer Reportedly at Issue.; TheStreet, Inc.; (Oct. 22, 2021); https://www.thestreet.com/investing/carvana-stock-lower-complaints-from-consumers-reportedly-rise.

[20] J. Adelman; Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars.; Barron's; (June 24, 2022 7:41 pm ET); https://www.barrons.com/articles/carvana-used-cars-registration-problems-51656111441.

114.     Barron's article illustrates numerous examples of customers nationwide that fell victim to Carvana's unfair and deceptive practices, such as selling used cars without holding title, improper re issuance of temporary out of state plates, and without prior state inspections.

115.     Barron's article references the case of William Stalls, a hospital lab assistant in North Carolina who bought a 2012 Hyundai Sonata from Carvana in January 2021 . Over the next 12 months, Stalls was issued temporary plates from Georgia, Tennessee, Arkansas, and Arizona. He was also arrested after being pulled over for speeding when police found in a database that the car was still registered under the name of the prior owner.

116.     While used car sales are competitive and usually with small profit margins after factoring in costs of compliance with licensing and dealership laws and regulations, the loss of over 100-unit sales in one year was a significant hit to Plaintiff's bottom line, market share, and continued capacity to do business legitimately in the state.

117.     Plaintiff is informed and believes that Carvana's market entry in North Carolina through the pattern of unfair and deceptive trade practices acts described herein is the cause in fact, and a proximate and substantial factor in sales losses in 2018 and continuing to the present. Plaintiff will retain appropriate accounting consultants to determine actual competitive injury and harm.

118.     Defendants' conduct is not only causing direct and measurable harm to Plaintiff but is also causing similar harm and losses to the entire industry of legitimate used motor vehicle dealers duly licensed and authorized to do business in North Carolina.

119.     The herein-described unfair and deceptive practices have given Carvana an unfair market advantage over Plaintiffs and all Members of the Class(s), by directly causing them losses in their profits and loss of market share while at the same time negatively affecting the public's

image of used car dealers at large and the state of consumer rights more generally by openly ignoring the civil regulatory schemes for used car dealers.

120. Carvana is engaging in unlawful competition with legitimate licensed and compliant auto dealerships by engaging in a pattern of unfair and deceptive practices which flagrantly violate motor vehicle dealer licensing laws; misled consumers by advertising sales from fictitious and unlicensed locations and advertising sales of vehicles owned by third parties, all without disclosing this critical information to potential buyers. By engaging in this pattern of unfair and deceptive trade practices, Carvana has gained an unlawful advantage in the market share of used car sales in North Carolina and across the nation, adversely affecting competitors including Plaintiff and Class Members.

121. Plaintiff's losses continue as Carvana's illegal and anti-competitive activities proliferate, in an amount to be proven at trial. Plaintiff intends to utilize discovery to obtain Carvana sales records to calculate the ill-gotten gains over lawfully and legitimate competitors in the proposed Plaintiff Class. The total amount, for both proposed classes in this complaint, is to be proven at trial and expected to exceed any relevant jurisdictional minimums.

122. As a direct, legal, and proximate cause of Carvana's previously mentioned illegal, false, unfair, and deceptive business practices, while operating as a used car dealership in North Carolina, Plaintiff and class members have suffered a direct, finite financial, and competitive injury and harm through lost sales and inability to compete with the Carvana's illicitly obtained market advantages.

## CLASS ACTION ALLEGATIONS

123. Preceding paragraphs are realleged and reincorporated by reference herein.

124.     Plaintiffs seek to pursue claims for declaratory, injunctive, and monetary relief in accordance with Rule 23 of the Federal Rules of Civil Procedure as representatives of two overlapping classes defined as follow: The first class, referred to here as the "State Class," represented by Plaintiff in this action, and of which Plaintiff is himself a member, consists of all North Carolina individuals or entities (irrespective of business form) duly licensed by the North Carolina Department of Motor Vehicles to operate as dealerships for the marketing and sales of used motor vehicles at any time from four years prior to the commencement of this action, or such other time as deemed proper by the Court. The second class, referred to here as the "National Class" or "Lanham Class," represented by Plaintiff in this action, and of which Plaintiff is himself a member, consists of all individuals or entities (irrespective of business form) in the 50-states duly licensed by their respective State's law to operate as dealerships for the marketing and sales of used motor vehicles at any time from four years prior to the commencement of this action, or such other time as deemed proper by the Court.

125.     Membership for these classes is so numerous that the individual joinder of members is impractical. Although the exact number and identities of class members are unknown at this time and can only be ascertained through appropriate discovery, Plaintiff estimates and believes the number of individuals and business entities in the proposed class exceeds 1,000 members for the State Class. The quantity and identity of such membership is ascertainable via inspection of the North Carolina DMV licensee records. Plaintiff is currently still determining the approximate size of the proposed National Class.

126.     The claims of the named Plaintiff and other class members are typical of the claims for all the class members, as all members sustained the same type of injury. Defendants' practices, as described in the factual allegations above, affected the members of the class in similar ways by

unethically reducing the market share of legitimate dealers by simply ignoring compliance with applicable regulations and/or engaging in false advertising practices.

127.    Named Plaintiff will fairly and adequately protect the interest of the class members, all of whom are victims of the Defendants' unfair and deceptive practices, and further has no interest antagonistic to those of the class members.

128.    Plaintiff has retained a national Plaintiff class action law firm, experienced in prosecuting complex civil litigation, and competent for the purposes of litigating this matter. [21]

129.    There are various shared questions of law and fact arising out of Defendants' conduct to the two classes, making this an appropriate case for resolution utilizing a class action. The common issues include, but are not limited to, the following:

a.    Whether Defendants engaged in a uniform practice of violating dealer licensing laws across North Carolina by:

i.    Not delivering the vehicle title to the DMV on time;

ii.    For improperly issuing and reissuing out-of-state temporary tags and plates to buyers who had no connection to the states from which the temporary tags and plates were issued;

iii.    For routinely reissuing multiple temporary license tags in violation of state laws;

iv.    For selling vehicles without state inspections;

v.    Failure to comply with established salesroom requirements;

b.    For deceptively advertising used vehicles for sale from off-site, unlicensed, and fictitious locations and therefore unfairly attracting business away from Plaintiff's and class members' businesses, thereby causing them harm;

---

[21] Our Difference; Napoli Shkolnik PLLC; https://www.napolilaw.com/our-difference/; (last visited Nov. 18, 2022)

c.    For deceptively advertising used vehicles for sale owned by third parties without disclosing this critical factor to the potential purchaser. and therefore, unfairly attracting business away from Plaintiff's and class members business, thereby causing them harm;

d.    Whether used car dealers have a right of class relief based upon a single market-competitor's widespread violations of used motor vehicle dealers licensing laws;

e.    Whether Defendants engaged in a uniform deceitful practice of listing cars from third parties and selling them as their own through unlicensed locations without disclosing these facts to the potential buyers and whether Plaintiffs have a right of class relief based upon this mentioned practice;

f.    Whether the Defendants' sales practices were unfair and deceptive, negligent, fraudulent, or in violation of other requirements of the law, and if so—whether those illicit practices resulted in an unlawful seizure of market share by the Defendant;

g.    Whether the Defendants' practices concerning the advertising and sales of used motor vehicles were unfair and deceptive, negligent, fraudulent, or in violation of other requirements of the law;

h.    Whether Carvana improperly held itself acted as a motor vehicle dealer and/or used motor vehicle dealer in accordance with the definition of North Carolina Department of Motor Vehicles laws or other applicable state's laws and regulations and otherwise through its consumer marketing violated the law's referenced in Plaintiffs complaint;

i. Whether class members suffered actual damages;

j. Whether Defendants' improper practices occurred across the various dealerships and/or unlicensed locations;

k.      Whether class members have a right to actual, statutory, treble, and punitive damages, injunctive or equitable relief;

l. Whether all Defendants are jointly and severally liable for Carvana's unfair and deceptive practice and whether class members are entitled to attorneys' fees;

130.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy given that:

a.      Common questions of law and fact predominate over individual questions that may arise, such that there would be efficiencies in litigating the common issues class-wide instead of on a repetitive, individual basis;

b.      The size of any given class member's damage claim may be too small to make individual litigation an economically viable alternative, such that few class members have the means or interest in controlling the prosecution of separate actions;

c.      A class action is required for optimal deterrence, optimal compensation and to limit the court-awarded reasonable legal expenses incurred by Class Members;

d.      Should individual class members be required to bring separate actions, Courts would be confronted by a multiplicity of numerous duplicative lawsuits, thus burdening the fair and just administration of justice. This creates an unreasonable and unnecessary risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results would magnify the delay and expense to all parties and the Court system, this class action will present fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single Court; and

e.      The conduct of Defendants with respect to the class members has been uniform. Defendants treated each of the Class Members in a comparable manner.

131.     Each Class Member will be identified through discovery and will be notified and given an opportunity to opt-out of the class in the event they have no interest in being represented by this action or prefers to be excluded from the class. The judgment will not be binding on those members who opt-out of the class. Consequently, any potential class members who have an interest in prosecuting separate claims and controlling their own litigation against Defendants will not be prejudiced by these actions.

132.     The relevant period for the State and National classes should be determined as being no shorter than the statute of limitations for the respective causes of actions relevant for those classes relative to the initial filing of this action in 2022.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### UNFAIR AND DECEPTIVE TRADE PRACTICES
### (N.C. GEN. STAT. § 75-1.1 *et. seq.*)

133.     The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

134.     The North Carolina Unfair and Deceptive Trade Practices Act provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce are declared unlawful." N.C. Gen. Stat. § 75-1.1(a). Defendants' unfair and deceptive practices alleged herein constitute unfair and deceptive acts or practices in or affecting commerce pursuant to N.C. Gen. Stat. § 75-1.1. Defendants' practices are illegal, unfair, or deceptive acts or practices in the conduct of trade or commerce and are inherently deceptive.

135.     Plaintiffs are injured "persons" pursuant to § 75-16 because their businesses have been directly injured due to Defendants 'unfair and deceptive trade practices as described herein

136.     Defendants' actions alleged herein violate industry standards, offend public policy, and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to both Plaintiff and consumers.

137.     The sale of used motor vehicles is a consumer transaction within the meaning of trade or commerce.

138.     Defendants previously mentioned recurrent violations and / or circumventions of dealer licensing laws and their misrepresentations in their advertisements of vehicles for sale have caused injury to Plaintiffs as competitors.

139.     Carvana Defendants engaged in unfair competition with Plaintiff and class members by purposefully avoiding the legal requirements mandated by law to engage in used motor vehicle sales in North Carolina. Carvana Defendants' sales and profits thrived as a direct result of violating dealer licensing laws and consumer laws, while Plaintiffs' sales decreased as a direct result of Carvana Defendants' unfair competition. Carvana Defendants' pattern of violations under N.C Gen Stat. § 20-294 constitute violations of Chapter 75.

140.     These knowing and willful violations amount to an unfair and deceptive trade practice under North Carolina law. Defendants' used car sales practices proximately caused harm to Plaintiff and to the class. Plaintiffs and Class Members have been damaged individually or cumulatively in an amount to be proven at trial. The damages should be trebled, and Plaintiffs and Class Members should be allowed to recover attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.

141.     Plaintiffs are also entitled to seek, and do seek, injunctive relief. Plaintiffs are informed and believe, and thereon allege, that Defendants' unlawful, unfair, and unjust business practices described above present a continuing threat to members of the class and to members of the public in that Defendants continue to engage in these practices. Such practices have and

continue to cause great and irreparable injury to the public and to Plaintiffs as competitors, who must rigorously comply with North Carolina laws and regulations promulgated by the DMV, to maintain their dealer licenses. Indeed, as previously mentioned, both the state and national classes are likely to include various licensed dealers forced into bankruptcy caused by Carvana's illegal market share seizure as a part of the Garcias overarching "pump and dump" scheme.

142.     Injunctive relief is proper because Plaintiff, the Class Members, and the public have no adequate remedy at law. Damages alone cannot compel the Defendants to cease to engage in the unfair business practices described in this action. Plaintiffs allege that the benefit to the public good, as well as to Class Members, far outweighs the inconvenience to the Defendants of ceasing to engage in the various practices described herein that violate North Carolina's unfair and deceptive practices act pursuant to N.C.G.S. §75-1.1.

SECOND CAUSE OF ACTION
NORTH CAROLINA COMMON LAW UNFAIR AND DECEPTIVE TRADE PRACTICES

143.     The preceding paragraphs are realleged and incorporated herein by reference.

144.     Defendants' actions, as described above, were taken in the context of competition between business competitors.

145.     Defendant Carvana engaged in deceptive and unfair competition and misappropriated a commercial advantage that was rightfully earned by Plaintiff through investment, labor, and organization. Carvana falsely advertised through different marketing platforms and through its own website portal, carvana.com to the consuming public to have available units for sale within Hickory, and other areas within North Carolina , where they do not have a licensed dealership, established office or salesroom, nor have licensed North Carolina sales representatives.   Carvana misleads customers and, in so doing, misappropriates Plaintiff's

commercial advantage as a Bona Fide Used Car Dealer in Caldwell County, and that of the respective state-class members in North Carolina.

146.     The actions or omissions as described above were intentional, malicious, and willful and wanton.

147.     The foregoing conduct of Defendants constitutes unfair and deceptive methods of competition.

148.     Defendants are liable, jointly, and severally, for the damages Plaintiffs have suffered as a result of Defendants' unfair competition.

149.     As a direct and proximate result of Defendants' unfair competition, Plaintiff has suffered injury, including without limitation lost sales and revenues, damage to Plaintiff's goodwill, and corresponding diminution in value of Plaintiff's business.

150.     Plaintiffs have suffered and continue to suffer harm because of Defendants' unfair competition in an amount to be determined by a jury.

151.     Plaintiffs are entitled to an award of its damages, punitive damages, costs, interest, and attorneys' fees.

152.     Defendants' unlawful and wrongful activities described in this Complaint are unfair methods of competition, unfair and deceptive acts or practices, and unconscionable business conduct, all in violation of North Carolina common law.

THIRD CAUSE OF ACTION
FALSE ADVERTISING (LANHAM ACT)
15 U.S.C § 1125(a)(1)(B)

153.     The proliferation of search engine technology has generated a new and important source of customers: Internet users who employ search engines like Google, Yahoo!, and Bing to locate the website of their preferred and can search things like "used car dealerships near me."

154.     The Internet is an instrumentality and channel of interstate commerce since it is part of the international network of interconnected computers.

155.     General Internet searches occur, inter alia, when a user goes to a search engine website and executes a query there, or when he enters a query into his browser's search bar and a pre-designated search engine operating in the background executes it. For example, a user might conduct a general Internet search by querying "used car sale in Hickory."

156.     The handheld general search market is a submarket of the Internet general search market. The former captures Internet general searches performed on portable, wireless, handheld smartphones and tablets. The latter captures Internet general searches performed not only on these handheld devices, but on desktop and laptop computers, too.

157.     Upon information and belief, handheld general search occurs when a smartphone or tablet user performs an Internet search query on his or her device. If, for example, the user wants to know where the nearest used car dealership is located, he might type his query into the search bar of his mobile browser. The browser then will hand off the request to a pre-set search engine, such as the Google search engine, which will operate behind the scenes to execute her request. Or he might use a dedicated search app, for example a Google-branded app that was pre-loaded onto her phone and enter her search term there. When he does so with a Google search app, the search is processed through the Google search engine.

158.     Upon information and belief, Google.com is the most frequently used search engine in the United States with a market share around 84.08%. Google searches are conducted on all devices, including laptops, desktops, mobile phones, and tablets.

159.     Upon information and belief, Google and other search engines platforms makes its money by selling advertising. The primary component of its advertising profits is search

advertising. If an individual conducts a search for "used car sale in hickory," that is run by Google's search engine, he will be returned not only a series of organic results in the form of links to responsive websites, but also, he often will be returned a series of advertisements at the top and/or right of the results page or pages.

160.     These search advertisements are based on a computerized analysis of the search terms that the individual entered, and paid ads are served as a function of a bidding process that advertisers have undertaken in order to "buy" words in the search query.

161.     Search advertising results in billions of dollars of revenue to Google annually. In 2022, Google's ad revenue amounted to 224.47 billion U.S. dollars.[22]

162.     Google monetizes search in large part by selling search-related ads that are displayed when a Google search is executed. Name recognition and search -engine optimization is defined as the practice of designing a website and service offerings to ensure that a business's name appears at or near the top of search engine results this engine are crucial to winning the business of Internet-oriented consumers.

163.     Carvana's website appears high on the list of search results when a consumer types "used car sale in Hickory", which is advantageous for selling the part over Plaintiff's website that appears lower in the search results.

164.     Carvana portrays a vast catalog of options with the availability of the exact model the consumer wants. Carvana deceptively does this since it advertises it has units available within a specific area—when, in fact, Carvana has no cars in that area.

---

[22] T. Bianch; Google: annual advertising revenue 2001-2022. Statista (Feb 13, 2023)
https://www.statista.com/statistics/266249/advertising-revenue-of-google/#:~:text=Advertising%20accounts%20for%20the%20majority,revenue%20comes%20from%20search%20advertising.

165.     More specifically, Carvana uses Google' search advertisement, as described above, to target potential consumers in Hickory, North Carolina where it does not have a licensed dealership (See below).



166.     These Carvana advertisements are literally false and a misleading representation of fact as Carvana have those units in another location, county, city, or even another state. Carvana pays for this search advertisement without disclosing this critical fact to the consumers.

167.     Defendants' literally false and/or misleading representations of fact in Defendants' commercial advertising misrepresent the nature, characteristics, and qualities of Defendants' commercial activities to Plaintiff's detriment, constituting false advertising in violation of 15 U.S.C §1125(a)(1)(B).

168.     Through this misleading practice, Defendants' supplied information to the consuming public which was published on Defendants' website www.carvana.com, and in targeted

marketing which are literally false, misleading, or inaccurate. This misleading information is reasonably likely to deceive the general consuming public (See Below).



169.     These literally false and misleading statements are material and not common puffery. Defendants' statements, advertising, and promotions are material misrepresentations upon which customers and potential customers have relied upon or will rely upon.

170.     Carvana has disseminated its literally false or misleading advertising in interstate commerce through its commercial advertising or promotion appearing in various formats, including but not limited to Google's selling search-related ads and its website www.carvana.com.

171.     As a direct and proximate result of Defendants' herein referenced acts and omissions, Plaintiffs have been damaged in an amount to be proven at trial.

172.     Plaintiffs have been damaged as a direct and proximate result of Carvana's literally false advertising and acts of unfair competition. Plaintiffs have been or are likely to be injured by Carvana's literally false ads, by direct diversion of sales to Carvana.

173.     Plaintiffs' dealerships focus on supporting customers within their immediate geographic area with quality sales work and stellar service, with a view toward building a strong reputation within the area closest to the dealership's facilities (i.e., a dealership's primary geographic or market area).

174.     A disproportionally large percentage of all advertising and promotional activities undertaken by Plaintiffs are directed at consumers that work or reside within their immediate or primary geographic or market areas because, among other things, a disproportionally large percentage of all used car sales made by Plaintiff dealership typically come from customers that work or reside within their immediate or primary geographic or market areas.

175.     Plaintiffs, however, are severely impacted by the illegal advertising and promotional activities of Carvana to sell vehicles to customers that are within Plaintiffs' primary geographic or market areas.

176.     Carvana has been unjustly enriched as a result of its literally false or misleading advertising claims, all to the detriment of Plaintiffs.

177.     Carvana's literally false advertisements are deliberate and egregious attempts to deceive the public.

178.     Carvana's literally false advertisements have deceived or are likely to deceive a substantial number of reasonable consumers.

179.     Carvana's literally false advertisements are material because they are likely to influence reasonable consumers' purchasing decisions.

180.    On information and belief, Defendants' acts have been deliberate, willful, wanton, and malicious an done with the intent to deceive the public. Plaintiffs are therefore also entitled to an award of attorneys' fees and costs and treble damages. Plaintiffs will continue to suffer irreparable harm unless and until Defendant is enjoined from such acts and Plaintiffs further requests injunctive relief against Defendants from preventing Carvana's continued use of literally false advertising.

181.    Carvana's literally false and misleading advertising and promotion in interstate commerce constitutes false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

FOURTH CAUSE OF ACTION
MOTOR VEHICLE DEALERS AND MANUFACTURERS LICENSING LAW
N.C. GEN. STAT. § 20-308.1

182.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

183.    This claim is brought under the Motor Vehicle Dealers and Manufacturers Licensing Law, N.C. Gen. Stat. § 20-285 et seq. ("Dealer Act"). The Dealer Act reflects the North Carolina General Assembly's finding as expressed in N.C. Gen. Stat. § 20-285 of a need to "prevent frauds, impositions and other abuses upon its citizens and to protect and preserve the investments and properties of the citizens of this State."

184.    Plaintiffs and some or all of the Defendants are "motor vehicle dealers" as defined by N.C. Gen. Stat. and "used motor vehicle dealers" as defined by N.C. Gen. Stat. § 20-286(16).

185.    The motor vehicle purchases were "retail installment sales" as defined by N.C. Gen. Stat. § 20-286(15).

186.    Defendants are/were required to be licensed under N.C. Gen. Stat. § 20-287.

187.     Defendants' licenses to operate as used motor vehicle dealers in two locations in North Carolina have been suspended and/or placed on probation for violations under N.C Gen Stat. section 20-294 for selling used vehicles without proper titles, inspections, plates, and other issues as established above that also represent non-compliance with the Department's laws and regulations.

188.     Through their operational scheme of selling used cars online by misleading and false advertising, Defendants aim to disrupt the used car market by bypassing dealership rules and requirements in the State of North Carolina. By doing so, Defendants have unfairly gained a market share advantage over legitimate competitors, causing them losses and harm.

189.     Defendants engaged in violations of N.C. Gen. Stat. § 20-308.1 which were willful, malicious, or wanton, or which were continued into multiple violations, and Plaintiff and Class Members are entitled to recovery of punitive damages, reasonable attorneys' fees, and costs.

190.     As a direct, legal, and proximate result of the Defendants' unlawful and unfair business practices, Plaintiff and Class Members have suffered injury in fact and harm in terms of lost sales and diminished profits in order to try to compete with the Defendants, who illegally and unfairly fail to pay the overhead costs necessary to run and operate a lawful and licensed auto dealership with licensed salespersons. When Defendants fail to comply with such requirements and regulations of the North Carolina DMV and the N.C. Motor Vehicle Dealers and Manufacturers Licensing Law, saving on compliance costs and engaging in false advertising to magnify its market share, it inherently and demonstratively causes injury to lawful competitors.

191.     Defendants' actions suggests that they believe they are not required to play by the same rules as other retail sellers of used vehicles in the State of North Carolina. By not delivering the vehicle title to the DMV on time, by improperly issuing and reissuing out-of-state temporary

tags and plates to buyers who had no connection to the states from which the temporary tags and plates were issued, by routinely reissuing multiple temporary license tags in violation of state laws, by selling vehicles without state inspections, by failing to comply with established salesroom requirements, and other regulatory infractions; and by selling used cars online by misleading and false advertising, Defendants are essentially bypassing the state's rules and regulations, while Plaintiffs and others are paying full-fare to operate their businesses in compliance with law. Accordingly, Plaintiff seeks, individually and on behalf of other similarly licensed dealerships authorized by the DMV to engage in used auto sales, restitution from the Defendants based on lost or diminished sales and lowered profit margins caused by Defendants' unlawful, unfair, and deceptive business practices, in an amount to be proven at trial in excess of $75,000.00.

192.    Defendants' conduct in operating a used vehicle sales operation in North Carolina without appropriate DMV licensure or following the appropriate licensing procedures constitutes unfair competition. Further, Plaintiff plan to seek orders granting preliminary and permanent injunctive relief prohibiting Carvana from engaging in sales transaction of used motor vehicles in the State of North Carolina, until such time as it is in full compliance with all state, local, and county licensing procedures, including selling used vehicles with their proper titles, inspections, plates, etc., and selling used cars online by non-misleading advertising.  As a result of Carvana operating as a dealer, without complying with the Department's laws and regulations, Plaintiff will seek to have Carvana cease and desist in its open disobedience of used vehicle dealership rules and requirements in the State of North Carolina and unfairly gaining a market share advantage over legitimate competitors.

193.    Further, in addition to restitution, declaratory, and injunctive relief, Plaintiff will seek an award of reasonable attorneys' fees and costs, pursuant to N.C.G.S. § 20-308.1.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff and Class Members from each of the two respective overlapping classes ask this Court to:

a.       Certify this case as a National and State-wide class action under F.R.C.P. Rule 23, designate the Plaintiff as class representative for each respective class, and designate the undersigned counsel/firm as class counsel for each respective class;

b.       Award the Plaintiff and Class Members their actual, compensatory, economic, statutory, and any other damages to which they may be entitled in an amount to be determined at trial, for the herein alleged improper conduct of the Defendants;

c.       Award the Plaintiff and Class Members monetary, declarative, and injunctive relief as herein above requested;

d.       Award Plaintiff and Class Members the costs of suit, any discretionary costs as may be allowable by law, pre-judgment and post-judgment interest, attorney's fees, and any increased or treble damages or exemplary or punitive damages allowed by law;

e.       Enter an Order enjoining Defendants from engaging in further wrongful practices alleged herein or uncovered in discovery; and

f.       Award such other and further relief as the Court deems just and proper.

Respectfully submitted by Plaintiff's undersigned counsel.

Cary, North Carolina

Date: March 3rd, 2023

**NAPOLI SHKOLNIK**

By: */s/ Nevin Wisnoski*
Nevin Wisnoski
NC Bar No.: 55038
1213 Culbreth Drive, Suite 216
Wilmington, NC 28405
(919) 374-1971
Email: nwisnoski@napolilaw.com

Salvatore C. Badala
(To submit *pro hac vice*)

400 Broadhollow Road
Melville, NY 11747
(212) 397-1000
(646) 843-7603
Email: sbadala@napolilaw.com

Rebeca Martinez Sicari
(To submit *pro hac vice*)
Maria Nery
(To submit *pro hac vice*)
Jesus Fernandez
(To submit *pro hac vice*)
Arturo Gigante
(To submit *pro hac vice*)
1302 Avenida Ponce de Leon
Santurce, PR 00907
T: (787) 493-5088